EUGENE T. FLEWELLEN AND MARGARET S. FLEWELLEN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 70943. Filed May 11, 1959.

*John M. Smith, Esq.*, for the petitioners.
*Douglas M. Moore, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in petitioners' income taxes as follows:

| Year | Amount |
|------|--------|
| 1954 | $1,241.92 |
| 1955 | 3,356.17 |

The primary issue presented for decision is whether the donative assignment to a tax-exempt charitable donee of certain rights to receive specific sums out of petitioner's royalty interests in the production of oil and gas, which assignment consisted of both in-oil payments and sums due petitioner for minerals already produced and marketed, resulted in an anticipatory assignment of future income. An issue relating to the amount to be allowed petitioners as charitable deductions in each of the above years has been disposed of by stipulation of the parties.

### FINDINGS OF FACT.

Some of the facts are stipulated, and, to the extent so stipulated, are incorporated herein by this reference.

The petitioners are husband and wife residing in Longview, Texas. They filed joint returns for the calendar years 1954 and 1955 with the district director of internal revenue at Dallas, Texas. Said returns were prepared on the cash basis of accounting.

On August 16, 1954, Eugene Flewellen (hereinafter referred to as petitioner) authorized the Magnolia Petroleum Company to pay $3,000 to the Flewellen Charitable Foundation (hereinafter referred to as the foundation) out of petitioner's interest in oil runs from the Flewellen-Samedan lease, Marshall Mann Survey, Gregg and Upshur Counties, Texas. The authorization provided as follows:

STATE OF TEXAS }
COUNTY OF GREGG }
  Attention: MR. L. F. WALKER
MAGNOLIA PETROLEUM COMPANY
*Dallas, Texas*

Gentlemen:

I hereby assign an oil payment to The Flewellen Charitable Foundation, c/o of E. T. Flewellen, 208 East South Street, Longview, Texas, in the sum of $3,000.00, (Three Thousand Dollars), this money to be from any monies that may be due me by reason of my interest in the Flewellen-Samedan lease, located in the Marshall Mann Survey of Gregg and Upshur Counties, Texas, from which lease your Company is presently running the oil.

This oil payment is to commence with any oil runs made in the month of August, 1954 and to continue until the full sum has been finally paid.

Thanking you for your attention to this matter for me, I am,

    Very truly yours,

Witness: /s/ W. H. Nicholas          /s/ E. T. Flewellen
       W. H. NICHOLAS.           E. T. FLEWELLEN.

On August 25, 1954, Magnolia Petroleum Company acknowledged the receipt of the aforesaid assignment from petitioner's royalty interest in the Flewellen-Samedan lease and advised petitioner that Magnolia's accounting department had been instructed to make settlement as petitioner had directed until such time as an amount of $3,000 had been paid.

Pursuant to the above assignment, Magnolia Petroleum Company paid $3,000 to the foundation out of petitioner's $254/1920$ of $1/8$ royalty interest in the oil runs from the Flewellen-Samedan lease. The date and amount of each particular payment, together with the month in which the oil for which each payment was made was run, are as follows:

| Month and year | Check dated | Amount | Month and year | Check dated | Amount |
|---|---|---|---|---|---|
| Aug. 1954 | Sept. 12, 1954 | $240.69 | Feb. 1955 | Mar. 12, 1955 | $260.28 |
| Sept. 1954 | Oct. 12, 1954 | 250.59 | Mar. 1955 | Apr. 12, 1955 | 304.95 |
| Oct. 1954 | Nov. 12, 1954 | 248.64 | Apr. 1955 | May 12, 1955 | 269.90 |
| Nov. 1954 | Dec. 12, 1954 | 241.25 | May 1955 | June 12, 1955 | 261.77 |
| Dec. 1954 | Jan. 12, 1955 | 267.44 | June 1955 | July 12, 1955 | 256.03 |
| Jan. 1955 | Feb. 12, 1955 | 292.94 | July 1955 | Aug. 18, 1955 | [1] 105.52 |
| | | | | | 3,000.00 |

[1] Balance due.

Of said $3,000, $120.35 was paid for oil produced prior to August 16, 1954, and the remaining $2,879.65 was paid for oil produced thereafter.

During the period January 1, 1954, through August 12, 1954, Magnolia Petroleum Company had paid $1,948.96 to petitioner and his assignees for petitioner's $254/1920$th of $1/8$th royalty interest in oil runs from the Flewellen-Samedan lease during the first 7 months of 1954. The total amounts so paid for oil run during each of said 7 months are as follows:

| Month | Amount paid | Month | Amount paid |
|---|---|---|---|
| January | $281.99 | May | $280.30 |
| February | 242.16 | June | 279.07 |
| March | 300.73 | July | 274.47 |
| April | 290.24 | | 1,948.96 |

On August 22, 1955, Magnolia Petroleum Company forwarded to petitioner a check made payable to the foundation in the amount of $105.52 in liquidation of petitioner's August 1954 assignment to the foundation and an additional check payable to petitioner in the amount of $142.02 representing the balance of petitioner's interest in July 1955 runs from the Flewellen-Samedan lease.

During the period August 18, 1955, through December 12, 1958, Magnolia Petroleum Company paid a total of $9,731.12 directly to petitioner for his royalty interest in oil runs from the above-noted lease during the period July 1, 1955, through November 30, 1958.

On May 6, 1955, petitioner authorized Willow Springs Operator to pay up to $5,000 to the foundation out of any amounts due petitioner for his interest in gas and distillate runs from the Driggers Well. Said instrument provided as follows:

LONGVIEW, TEXAS
208 East South St.
May 6th, '55

Attention: MR. JOHN WHITAKER
WILLOW SPRINGS OPERATORS
Southwest Reserve Life Bldg.
City

Gentlemen:

I am due a certain amount of money from you for my interest in gas and distillate runs, from the Driggers well, from the first runs through January of this year.

This will be your authority to pay, up to $5,000.00, (Five Thousand Dollars), of any amount so due me to the Flewellen Charitable Fund. The balance, if any, to be paid directly to me.

Please mail the check to the Fund to my address, as shown above.

Many thanks for your attending to this as directed.

Very truly yours,

Witness: /s/ W. L. Rogers     /s/ E. T. Flewellen
      W. L. ROGERS           E. T. FLEWELLEN

Pursuant to the above instructions, Willow Springs Operator drew its check No. 1285, dated May 24, 1955, payable to the Flewellen Charitable Fund in the amount of $5,000. The $5,000 was paid entirely out of back runs of gas and distillate that had been produced and passed into the pipeline of the Arkansas-Louisiana Gas Company prior to May 6, 1955.

On October 24, 1955, petitioner assigned to the foundation $2,000 to be paid from any amount due him or thereafter to become due him from his overriding royalty interest in runs of gas and distillate from the Castleberry Unit, Gregg County, Texas. Said instrument provided as follows:

Longview, Tex.,
*208 East South*
*Oct. 24, '55*

Attention: Mr. John Whitaker
Willow Springs Operators
*Southwest Reserve Life Bldg.*
*City*

Gentlemen:

I hereby make an assignment to the Flewellen Charitable Fund the sum of $2.000.00 (Two Thousand Dollars), to be paid from any amount that may now be due me and from future runs of gas and gas distillate, produced from the Castleberry Unit, in Gregg County, Texas, on which I own an overriding interest.

Please mail check to the said fund in care of me as shown above.

Thanking you for doing this for me, I am,

Yours very truly,

Witness: /s/ W. L. Rogers        /s/ E. T. Flewellen
         W. L. Rogers               E. T. Flewellen

Pursuant to the above assignment, Willow Springs Operator drew its checks, No. 3792 and No. 4372, dated November 22, 1955, and December 22, 1955, respectively, payable to the Flewellen Charitable Fund in the respective amounts of $1,925.22 and $74.78. Of the $1,925.22, $1,440.74 was paid out of petitioner's account receivable for back runs of gas and distillate that had been produced and passed into the pipeline of the Arkansas-Louisiana Gas Company prior to October 24, 1955. The remaining $559.26 was paid out of gas and distillate runs produced during October and November 1955.

The Driggers well and the Castleberry unit were both brought into production during the first half of 1953. As of the end of 1958, the said wells had always been able to produce as much gas as the regulatory authorities of Texas would allow. The Arkansas-Louisiana Gas Company took delivery of the production from the Driggers well and the Castleberry unit at the mouth of the wells. The amount of production going into said buyers' lines was measured by a meter on each well and the buyer would pay the operator 100 per cent of the proceeds of the production produced the month following that in which it was produced. The operator, in turn, paid the net value of the production, less taxes, to the owners of interests in the producing properties.

The production statement for the month of October 1955, which the Arkansas-Louisiana Gas Company supplied to the operator, actually covered production from September 26, 1955, through October 25, 1955.

On April 1, 1955, Flewellen's percentage interest, namely, 0.062795, in the Driggers well was recorded on the books of Willow Springs Operator. Flewellen, prior to May 1955, made a practice of frequently examining the books of Willow Springs Operator pertaining to his interests therein.

The division order on the Driggers well and the Castleberry unit

was not given petitioner until sometime after the date of the above-noted assignments.

During 1954 and 1955, the Flewellen Charitable Foundation was a charitable organization which satisfied the requirements of section 170 of the Code of 1954.

Petitioner's donations to the foundation on August 16, 1954, May 6, 1955, and October 24, 1955, of rights to receive specific sums out of petitioner's royalty interests in the production from oil and gas properties constituted, in substance and in fact, anticipatory assignments of petitioner's rights to receive future royalty income.

Petitioner realized unreported royalty income of $981.17, subject to percentage depletion of $269.82, in 1954 and unreported royalty income of $9,018.83, subject to percentage depletion of $2,480.17, in 1955 by reason of the aforementioned anticipatory assignments of royalty income.

The fair market value of the interest assigned to the foundation on August 16, 1954, was on that date $2,800.

The fair market value of the interest assigned to the foundation on May 6, 1955, was on that date $4,900.

The fair market value of the interest assigned to the foundation on October 24, 1955, was on that date $1,900.

OPINION.

*1954 Assignment.*

On August 16, 1954, petitioner authorized the Magnolia Petroleum Company to pay to the Flewellen Charitable Foundation the sum of $3,000 out of petitioner's royalty interest in oil runs from the Flewellen-Samedan lease. Pursuant to this assignment, the sum of $3,000 was paid out of petitioner's interest in production runs from the property during the period August 1954 through July 1955. Of said amount, $981.17 was actually paid in 1954 and $2,018.83 was so paid in 1955. It has been stipulated that $120.35 of the amount paid in 1954 was paid out of petitioner's interest in oil produced but not marketed prior to August 16, 1954.

Petitioner's interest in the production from the above property (less production taxes) for the first 7 months of 1954 totaled $1,948.96. As of December 1, 1958, petitioner was still receiving royalties from the same interest which compared favorably in amount to those received in 1954 and 1955.

The issue presented is whether the assignment to a charitable donee of an oil payment [1] carved out of the royalty interest constitutes, for

---

[1] An oil payment has been described by the Supreme Court as "the right to a specified sum of money, payable out of a specified percentage of the oil, or the proceeds received from the sale of such oil, if, as and when produced." *Anderson* v. *Helvering,* 310 U.S. 404 (1940).

Federal tax purposes, an anticipatory assignment of rights to receive future income and thus is taxable to a cash basis donor when and as received by the donee, that is, as if the donor himself directly received the payment and then assigned the proceeds to the donee.[2]

It would serve no useful purpose to extend this opinion to include an exhaustive analysis of the prior decisions of this Court and of the various Courts of Appeals which have dealt generally with this problem and the related issue of whether the sale of a carved out oil payment results in capital gain or ordinary income treatment to the assignor.[3]

The principles announced by the Supreme Court in *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260 (1958), have, in our view, determined this issue. In the *Lake* and consolidated cases, the Court was faced with the issue of whether the transfer of a carved out production payment was to be taxed at ordinary income rates or capital gain rates. In each of the 5 cases thus consolidated, the Court of Appeals for the Fifth Circuit held that there had been a sale of a capital asset and that the taxpayer was entitled to the benefit of the capital gain provisions.

The Supreme Court, in reversing the decisions of the Court of Appeals, held that the transactions were merely assignments of rights to future income. The Court applied the principle of *Helvering* v. *Horst*, 311 U.S. 112 (1940), and *Harrison* v. *Schaffner*, 312 U.S. 579 (1941), stating:

As we stated in Helvering v. Horst, supra, 117, "The taxpayer has equally enjoyed the fruits of his labor or investment and obtained the satisfaction of his desires whether he collects and uses the income to procure those satisfactions, or whether he disposes of his right to collect it as the means of procuring them." There the taxpayer detached interest coupons from negotiable bonds and presented them as a gift to his son. The interest when paid was held taxable to the father. Here, even more clearly than there, the taxpayer is converting future income into present income.

In so holding, the Supreme Court stated that it was proceeding on the premise relied upon by the Court of Appeals that oil payments are interests in land, but concluded that in order to obtain capital gains treatment, it must be shown that there was a conversion of a capital investment. The Court found that the lump sum received by the taxpayers was essentially a "substitute for what would otherwise be received at a future time as ordinary income."

---

[2] Petitioner, by stipulation and on brief, concedes that $120.35 of the $3,000 assignment had already been produced and inferentially accrued to petitioner prior to August 16, 1954. In other words, this amount is not to be considered as part of the carved out oil payment involved herein, but will be discussed *infra*.

[3] For a historical analysis, see 4 Oil and Gas Tax Quarterly 116 (1955) ; 7 Oil and Gas Tax Quarterly 245 (1958) ; P.-H., Oil and Gas Taxes par. 1004 ; Breeding & Burton, Taxation of Oil and Gas Income, p. 62 (1954) ; 2 Mertens, Law of Federal Income Taxation, sec. 18.13 (1955).

In the case at bar, petitioner relies on *Lester A. Nordan*, 22 T.C. 1132 (1954). He states the issue as follows: "[T]he only question left is, does the Nordan case apply or does the Lake case apply."

In *Nordan*, we held that the donative assignment there involved did not convey merely the right to future income. We said (at p. 1134):

This case is not distinguishable in principle from *R. E. Nail et al., Executors,* 27 B.T.A. 33, cited with approval in *McCulley Ashlock,* 18 T.C. 405, 412. The Commissioner acquiesced in that case but withdrew his acquiescence in 1949. These petitioners did not convey merely the right to $115,000 of future income. * * * *The Commissioner has stipulated that they conveyed property which had a fair market value at the date of transfer of $111,925.95.* Cf. Regs. 111, sec. 29.23(o)–1. *No income from the property had accrued at the date of the transfer by gift of the oil, gas, and minerals in place. The income accrued from the production of oil after the petitioners had conveyed the property.* * * *[Emphasis supplied.]

It is thus apparent that our decision was predicated upon the finding (stipulated) that *Nordan* assigned "property," the fair market value of which was likewise stipulated. Title to the property itself (subject to a contingent reversion) passed to the donee. In *Lake*, however, the Supreme Court made it clear that the proceeds from the assignment of carved out oil payments are to be treated as anticipatory assignments of future income and not the conversion of a capital investment. We think it apparent that the facts in the instant case bring it within the principles announced in *Lake* and exclude it from the application of the rule of *Nordan*.

We hold, therefore, that petitioner realized unreported income of $981.17, subject to percentage depletion of $269.82, in 1954 as the result of the assignment of a carved out oil payment to the Flewellen Charitable Foundation.

### 1955 Assignments.

On May 6, 1955, petitioner authorized Willow Springs Operator to pay up to $5,000 to the foundation out of petitioner's interest in the proceeds of gas and distillate from the Driggers well which had been produced prior to February 1, 1955. Pursuant thereto, Willow Springs Operator paid $5,000 to the foundation by check dated May 24, 1955. The $5,000 was payable entirely out of, and was in fact paid out of, petitioner's interest in gas and distillate produced and marketed prior to May 6, 1955.

Petitioner executed another assignment to the foundation on October 24, 1955. This assignment authorized Willow Springs Operator to pay $2,000 to the foundation from any amount then due or to become due from the production of gas and distillate from the Castleberry unit on which petitioner owned an overriding royalty interest. The operator thereafter paid the $2,000 to the foundation by checks dated November 22, 1955, and December 22, 1955, in the respective

amounts of $1,925.22 and $74.78. Of the $2,000 assigned, $1,440.74 was, in fact, paid out of petitioner's interest in gas and distillate produced and marketed prior to October 24, 1955.

Before embarking on a discussion of these assignments, we note that the stipulation of the parties establishes that $559.26 of the $2,000 assigned to the foundation on October 24, 1955, did not represent proceeds of gas and distillate produced prior to the assignment. The income tax treatment of this amount is governed by the principles discussed *supra* in relation to the 1954 assignment. Similarly, to the extent of $120.35 of the $3,000 assigned in 1954, which was not an oil payment, the income tax status will be determined by what we have to say *infra* regarding the 1955 assignments.

An analysis of the Supreme Court's definition of an oil payment in *Anderson* v. *Helvering, supra*, as noted above, as well as the commonly understood meaning of that term in the oil and gas industry,[4] convinces us that such an oil or gas payment refers to minerals in place.

Proceeding on that premise, we have found that the assignments in 1955 (with the above-noted exception of $559.26) were not technically in-gas payments. However, these donative assignments by petitioner still resulted in anticipatory assignments of future income and are taxable to petitioner as such.

At the time petitioner made each of his assignments in 1955, the minerals had, for the most part, been both produced and marketed. Thus, the interest of petitioner at the date of the assignment resembled an account receivable. The written assignment of May 6, 1955, was, by its terms, payable only out of moneys due petitioner from his interest in prior gas and distillate runs from the Driggers well. The parties stipulated that $1,440.74 of the $2,000, assigned as of October 25, 1955, was paid out of petitioner's "account receivable for back runs of gas and distillate" produced and marketed from the Castleberry unit prior to the assignment date.

The rationale of the *Lake* case is that the assignment of a carved out production payment results in the anticipatory assignment of future income. Such assignment in the *Lake* case was of minerals in place.

If an assignment of the right to receive royalties from oil and gas not yet produced constitutes an anticipatory assignment of future income, then, clearly, the assignment of rights to receive the proceeds of oil or gas already produced but not marketed, and to receive the proceeds of gas and distillate already produced and marketed, likewise constitutes an anticipatory assignment of future income. *Moore* v. *Thomas*, 145 F. 2d 813 (1944).

[4] Breeding & Burton, Taxation of Oil and Gas Income, p. 25 (1954). See also *Tennant* v. *Dunn*, 130 Tex. 285, 110 S.W. 2d 53 (1937).

Borrowing the simile from *Helvering* v. *Horst, supra*, the 1954 assignment was of the fruit of the tree and not the assignment of the tree itself. The only difference between the assignment of 1954 and those in 1955 is that in the latter year the fruit was riper; indeed, it was both harvested and marketed.

Petitioner contends that the 1955 assignment cannot be considered as in the nature of an account receivable because the oil operator had not furnished petitioner with a division order [5] prior to the dates of the assignments.

Assuming, *arguendo*, that this is significant, the parties stipulated that $1,440.74 of the $2,000 assigned on October 24, 1955, was paid out of an "account receivable" for backruns. With respect to the assignment of May 6, 1955, the record establishes that on April 1, 1955, an entry was placed on the books of Willow Springs Operator showing that petitioner owned a 0.062795 interest in the production from the Driggers well. We have also found that prior to May 6, 1955, petitioner frequently visited the office of Willow Springs Operator and examined the books relative to his interests therein. The circumstances presented in the record give rise to the clear inference that petitioner knew at the time of the May 6, 1955, assignment substantially what his interest was in the Driggers well prior to May 6, 1955. In any event, petitioner has failed to meet his burden of proof to the contrary. We may add that the assignment of May 6, 1955, was, by its terms, payable only out of moneys then due petitioner from his interest in the Driggers well.

The lack of a division order is not controlling and is not a condition precedent to the establishment of the existence of a debt. It may well be a helpful technique in valuing the debt or in measuring the exact ownership interest. It does not follow, however, that the division order creates the underlying interest of petitioner—hence the obligation to pay him whatever that interest calls for—or is necessary to the creation thereof.

Finally, it is clear that at the end of calendar year 1955, petitioner knew exactly how much money was paid by Willow Springs Operator to the foundation under the assignments executed by him.

We hold, therefore, that petitioner received unreported income of $9,018.83, subject to percentage depletion of $2,480.17, in 1955 by reason of his anticipatory assignment of such royalty income to the Flewellen Charitable Foundation.

---

[5] A division order has been defined as "[a]n order, signed by all of the owners of an interest in an oil and gas property, directed to the company purchasing production from the property. The order sets forth the interest of each of the owners and serves as the basis on which the purchasing company pays each of the owners his respective share of the proceeds of the oil and gas purchased." P.-H. Oil and Gas Taxes par. 10,001. See also Breeding & Burton, Taxation of Oil and Gas Income, pp. 122, 123 (1954).

*Allowable Charitable Contributions.*

The issues relating to the amounts allowable to petitioners as charitable deductions in the respective years involved have been resolved by stipulation of the parties.

*Decision will be entered under Rule 50.*